# 680

CARGO & TANKSHIP MANAGEMENT CORPORATION, as agents for American Tramp Shipping Development Corporation, bareboat owners of the S.S. MOUNT EVANS, Libelant,

v.

INDIA SUPPLY MISSION and the President of India, Respondents,

v.

UNITED STATES of America, Respondent-Impleaded.

United States District Court
S. D. New York.
Sept. 24, 1963.

Healy, Baillie & Burke, New York City, for libelant.

Baker, Nelson, Williams & Mitchell, New York City, for respondents; Robert M. Atkinson, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for respondent-impleaded, the United States; · Louis E. Greco, Atty. in Charge, William H. Postner, Atty. Admiralty and Shipping Section, Dept. of Justice, of counsel.

WYATT, District Judge.

This controversy arises out of the ocean transportation of wheat from this country to India. The importation of the wheat into India, and its transportation there, were being financed by the United States under the authority of Congress granted in Title I of the Agricultural

Trade Development and Assistance Act of 1954 ("the Act"), specifically Sections 101–109 thereof (7 U.S.C. §§ 1701–1709; the Act, passed in 1954 by the 83d Congress, is often referred to as Title I, Public Law 480). The Congressional policy, speaking broadly, was to use sales for foreign currencies of surplus agricultural commodities to expand trade with friendly nations, make efficient use of the commodities, facilitate currency convertibility, etc.

The functions of the President under the Act were by him delegated to the Secretary of Agriculture, who then made Regulations governing procedure (7 CFR 1.1 and following).

Libelant Cargo & Tankship Management Corporation ("Management" or "owner") is the owner (or agent of the owner) of a United States-flag vessel, the "Mount Evans", and is here suing for freight and demurrage. Respondent is for all practical purposes the Government of India, here represented by respondent India Supply Mission (the "Mission"). India made an agreement with the United States for wheat under the Act and the Mission made a voyage charter of the Mount Evans to carry a cargo of such wheat to India.

After this suit was commenced, India, claiming that the United States is obligated to reimburse it for the cost of transportation of the wheat, impleaded the United States and the United States is now a party to the suit as Respondent-Impleaded.

Libelant owner moves under Admiralty Rule 58 for summary judgment directing the Mission to pay it $287,377.50 as freight and demurrage under the voyage charter of the Mount Evans. Respondent Mission opposes this motion for summary judgment and at the same time makes a companion motion (also under Admiralty Rule 58) for a summary judgment against the United States for any amount which the Mission may be required to pay as freight (not demurrage) in any summary judgment in favor of the owner.

The agreement between India and the United States for purchase by India of wheat under the Act was dated May 4, 1960.

The Regulations (7 CFR 11.3, 11.4) require that under such an agreement "purchase authorizations" (PA) be obtained by the importing country.

India obtained from the Foreign Agricultural Service ("FAS", a division of the Department of Agriculture administering this program under the Act) two such purchase authorizations:

a. No. 10–58 (by assignment from Turkey), dated January 5, 1962, for $1,282,000 or about 20,000 tons of wheat; and

b. No. 39–65, dated January 29, 1962 (amended March 27, 1962) for $49,800,000 (as increased by the amendment) or about 800,000 tons of wheat.

Each PA contained a special provision that at least 50% of the wheat had to be shipped in United States bottoms, that advance approval of charters must be secured, and that for each vessel approved an "Advice of Vessel Approval" would be issued which would indicate whether Commodity Credit Corporation ("CCC", an agency of the United States within the Department of Agriculture, 15 U.S.C. § 714 and following) would finance ocean transportation and whether a "notice of arrival" would be required.

The Regulations provide (7 CFR 11.-4(d) (8) (vi)) that every PA is "deemed" to include a provision that when a "notice of arrival" is required, it must be furnished promptly by the importing country or its agent and must give the vessel name, the PA number, the first discharge port and the date of arrival. The Regulations further provide (7 CFR 11.9(b) (2)) that "if required by the related CCC Form 106–2" there must be furnished to the CCC "a notice of arrival at the first port of discharge of the vessel named in the CCC Form 106–2". The same part of the Regulations makes a limited exception to this, however, in that a notice of arrival will not be required if

a vessel is "lost or unable to proceed to destination \* \* \* because of damage caused by perils of the sea \* \* \* [and other force majeure conditions] \* \* \* without the fault of the supplier of the ocean transportation \* \* \* provided the owner \* \* \* supplies evidence satisfactory" to CCC.

India also obtained from FAS two "ocean transportation authorizations", each dated the same day as, and numbered to correspond with, the PAs. These authorized the procurement of ocean transportation "subject to the Regulations". They further stated that CCC would reimburse India for the cost of transportation of wheat covered by "Forms CCC–106" and "which is shipped on the vessels named in such forms". Reimbursement was to be made upon submission of the documents required by the Regulations plus an "Additional Documentation", namely, a certificate by the "supplier" of transportation as follows:

"The undersigned hereby certifies that the vessel named herein and for which the cost of ocean freight is claimed, qualifies as a privately owned United States flag commercial vessel within the requirements of Public Law 87–266 and is an eligible U.S. flag vessel for the purpose of Public Law 664".

Public Law 664 (of the 83d Congress) added to Section 901 of the Merchant Marine Act, 1936 (46 U.S.C. § 1241) a provision, in relevant part, that whenever the United States shall advance funds or credits in connection with furnishing commodities to a foreign nation, at least 50% of the tonnage thereof must be carried on "privately owned United States-flag commercial vessels" (46 U.S.C. § 1241(b)). Public Law 87–266 is an amendment to 46 U.S.C. § 1241(b) and in relevant part deals with requirements for inclusion within the term "privately owned United States-flag commercial vessels".

Having obtained the authorizations in January 1962 as described, India then made a voyage charter party, dated March 2, 1962, with Management for a voyage of the Mount Evans ("owner's option substitute Roxanne") to India with approximately 10,000 tons of wheat for freight of $28 per ton "to be payable on the vessel's arrival at the first port of discharge". The vessel is stated to be "tight, staunch and strong, and in every way fitted for the voyage to India". It is also stated that the charter party is "subject to" all of the provisions of Public Law 480 and the Regulations thereunder.

The charter party was then submitted to CCC. This was required by the Regulations (7 CFR 11.12(a)) which state that approval will be given on "Form 106", elsewhere defined as "Advice of Vessel Approval" and designated "106–2" for ocean carriers. In this instance three Advices of Vessel Approval were issued, each for a different quantity of grain but aggregating about 10,000 tons. They recited the Mount Evans as the vessel, that it was under the United States flag, and that the freight rate was $28 per ton. Each Advice of Vessel Approval stated an "ocean freight differential", in amount $18.27 for 1,000 tons, $15.84 for 4,370 tons, and $16.20 for 4,970 tons. This differential is that between the foreign-flag freight rate and the United States-flag freight rate and is important because when (as here) it is required that shipment be made in a United States-flag ship, the Regulations are so drawn that the added expense of the differential is *not* borne by the importing country but by the United States. Each Advice of Vessel Approval also carried this statement:

"Ocean freight to be financed by CCC. Notice of arrival is required."

The Mount Evans loaded a cargo of 10,150 tons of wheat at Galveston, Texas, from which she left for India on May 23, 1962.

On May 30, there was a crack in the hull in the engine room and the ship put into Newport News for repairs.

On June 2, she sailed again but on June 3 there was a leak in the hull plate,

much water was taken on, the pumps were unable to keep up, water got into some of the grain, an emergency existed and preparations were made to abandon ship. The Master managed to bring her back to Newport News.

The cargo was then discharged into grain elevators at Norfolk, Virginia. It appeared that some time would be required to make the necessary repairs. The officers and crew were signed off.

Management as owner and the Mission as charterer then made a written agreement, undated but said by libelant to have been made on or about June 29, 1962.

This agreement recites that "the Owners plan to forward the cargo on the S.S. 'Christitsa', or Owners' option similar substitute" and that this would be done "without the charging of additional freight". It is stated that the owner is willing to do this in return for certain agreements by the Mission affecting the General Average claim which apparently the owner meant to assert for the repairs required to be made to the Mount Evans. It is stated that the Mission agrees "to the above" in consideration for the owner's agreement to pay the cost of discharging the cargo at Norfolk from the Mount Evans. The agreement provides:

"This agreement shall not be construed as an admission of liability or as a waiver of any of the rights of the parties hereto under the original Contract of Affreightment."

The United States was not a party to this agreement for sending the wheat to India by the Christitsa. Counsel for the United States represents that the United States had no knowledge of that agreement and has never "approved or ratified" it. This is not challenged by libelant or by respondent and may be taken as established.

The Christitsa was a Greek-flag ship and the freight for its carriage of the wheat from Norfolk to India was $8.30 per ton, as contrasted with the $28 per ton rate (from Galveston to India) on the Mount Evans, a United States-flag ship.

The Regulations contained this provision (7 CFR 11.12(c) (2):

"In the case of transshipment from a United States-flag vessel to a foreign-flag vessel, the cost of ocean freight from the port of transshipment to the importing country will not be financed by CCC."

After the June 29 agreement had been reached between Management and the Mission, the wheat was loaded on the Christitsa. After allowing for handling loss, water damage, and a quantity left in the Norfolk bins, 9,950 tons of wheat were so loaded.

The Christitsa left Norfolk on July 12, arrived at its first Indian port on August 28 and duly delivered the 9,950 tons of wheat.

No notice of arrival was submitted by the Mission to CCC.

Libelant figures its freight due as $273,640, being 9,950 tons at $28 per ton less an agreed credit to the Mission of $4,960 for late arrival of the Mount Evans at Galveston.

Libelant also claims demurrage for time discharging in India "in excess of allowed lay time" (clause 22, charter party of the Mount Evans). The amount of demurrage claimed in the motion papers is $13,737.50 but this may be subject to some adjustment.

The facts, as stated herein, all seem to be undisputed.

There might be a dispute as to whether the Mount Evans was seaworthy or not and as to whether her inability to complete the voyage was due to fault of her owner. Such an issue could probably not be resolved on affidavits but in the view which this Court takes, that issue is not reached in determining these motions.

As to the material facts, it appears that there is no genuine issue and therefore the situation is one appropriate for summary judgment.

The two claims, that against the Mission and the claim over by the Mission against the United States, should be considered at the same time. They are inde-

pendent of each other, but are both part of the same picture.

It seems perfectly clear that there can be no recovery by the Mission against the United States.

■ The undertaking of the United States was to reimburse India for the cost of ocean transportation but subject to the Regulations and provided the necessary documentation was supplied. It was required in the authorization issued by the United States that the wheat be shipped in a "privately owned United States-flag commercial vessel". It was required that a "notice of arrival" be given and this was evidently to prevent transshipment in foreign-flag vessels at the much cheaper freight rate charged by them.

Neither of the conditions was met in this case. Moreover, the Regulations gave warning that if wheat was transferred from a United States-flag vessel to a foreign flag vessel, the cost of ocean freight from the port of transshipment to the importing country "will not be financed by CCC" (7 CFR 11.12(c) (2)).

Accordingly, by the plain terms of its undertaking—made manifest in advance in unmistakable language—the United States is not liable for any cost of the ocean freight.

But what about the situation as between libelant and the Mission? They were free to make any arrangement they desired as between themselves, whether it affected the Mission's right to reimbursement of ocean freight or not. They made such an arrangement in the agreement of June 29, 1962 under which the Mission agreed to a substitution of the Christitsa. The Mission got what it bargained for: carriage of the wheat to India.

The Mission denies liability to libelant, however, on these grounds: (1) that libelant has not explained the failure of the voyage of the Mount Evans so that FAS will waive a "notice of arrival"; (2) that the Mount Evans was unseaworthy and this was a breach of the charter party; (3) that libelant did not

secure approval by CCC of the substitution of Christitsa for the Mount Evans; and (4) that libelant has assigned its claim for freight and is not the real party in interest.

■ That the vessel was unseaworthy may be some defense to a General Average Claim if asserted by the owner, but seems irrelevant to a claim for freight because in fact the cargo was safely delivered to destination.

That no "notice of arrival" of the Mount Evans was given, that no waiver was secured from the CCC, and that no approval of the Christitsa was secured, all seem to be matters where the Mission had responsibility rather than libelant. It was the Mission which made an agreement with the United States and its indicated defenses are matters between the United States and the Mission concerning the latter's claim for reimbursement. Respondent states that "libelant received approval" of the Mount Evans but "did not secure approval" of the Christitsa. There is nothing to show that it was libelant who secured the approval by CCC of the Mount Evans. The approval form itself is addressed to "Continental Grain Co.", which evidently was the supplier of the wheat. The "authorization to procure ocean transportation" is not specifically addressed but seems to concern only the importing country. It states: "The importing country is hereby authorized * * * etc.". The Regulations seem to contemplate that the importing country will take the initiative as to compliance. For example, it is provided that the "notice of arrival" must be furnished "by the importing country or its designated agent" (7 CFR 11.4(d) (8) (vi)).

In any event, whatever may have been the situation under the March 2, 1962 charter party, effect must be given to the subsequent agreement of June 29, 1962. Under this later agreement, the Mission consented to a substitution of the Christitsa for the Mount Evans. The question of the amount of freight to be paid libelant is not expressly covered in the June 29 agreement, but this circumstance

strongly suggests that the freight under the March 2, 1962 charter party was to be paid. Moreover, the June 29 agreement states that the forwarding on the Christitsa is to be done by libelant "without the charging of additional freight". This also points to the charter party freight as controlling.

 After thus agreeing to a substitution of the Christitsa for the Mount Evans, the Mission cannot now avoid liability for freight because of that substitution.

The result, of course, is that the Mission pays more to the owner in freight than the owner pays to the Christitsa and at the same time the claim for reimbursement is lost.

But this result was known to the Mission at the time it made the June 29 agreement. Doubtless the Mission felt that there were compensating advantages in the June 29 agreement. The wheat was forwarded promptly to India instead of delaying in Norfolk while the Mount Evans was repaired; the owner paid the cost of discharging the Mount Evans; the position of the Mission as against a General Average Claim of the owner may have been improved.

Whether the net result be an advantage to the Mission or not, this Court cannot change the agreement of the parties and taking into consideration the June 29, 1962 agreement the Mission is liable for freight on the wheat at the charter party freight.

That the claim of libelant has been assigned does not mean that libelant is not the real party in interest. It appears that the assignment is to The Marine Midland Trust Company of New York and is as collateral security for a loan. In such cases the assignor retains sufficient interest to be the "real party in interest". Texas San Juan Oil Corp. v. An-Son Offshore Drilling Co., 194 F. Supp. 396 (S.D.N.Y.1961). If respondent has serious concern of a possible double claim by Marine Midland, the Court will direct that Marine Midland be brought in as a party or otherwise

agree to be bound by the judgment herein.

The foregoing sets forth the findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

The motion for summary judgment by libelant is granted. The motion for summary judgment by respondent against the United States is denied.

Settle order on notice.